FILED
2018 JUN 18 PM 2:42
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| ANGELA PRICHARD,<br><br>Plaintiff,<br>v.<br><br>NANCY BERRYHILL<br>Acting Commissioner of the Soc. Sec.,<br>Defendant. | **MEMORANDUM DECISION &<br>ORDER**<br><br>Civil No. 2:17-cv-01177-BSJ<br>Judge Bruce S. Jenkins |

Plaintiff, pursuant to 42 U.S.C. 405(g), 1383(c)(3), seeks judicial review of

the decision of the Acting Commissioner of Social Security (Commissioner)

denying his claims for Disability Insurance Benefits (DIB) and Supplemental

Security Income (SSI) under Titles II and XVI of the Social Security Act (the Act).

After careful review of the entire record, the parties' briefs, the relevant law, and

arguments presented at a hearing held on May 17, 2018, the Court FINDS that the

decision of the Commissioner should be REMANDED.

**Procedural History**

Plaintiff Angela L. Prichard ("Plaintiff") filed an application for Disability Insurance Benefits (DIB) on April 16, 2014, and for Supplemental Security Income (SSI) on May 23, 2014, alleging disability on March 7, 2014 (Certified Transcript of the Administrative Record "Tr." at 10). She alleged disability related to severe impairments of right breast cancer, degenerative disease of the spine, shoulders, hips, and knee, peripheral neuropathy, chronic pain syndrome, and obesity (Tr. 12, 70).

Plaintiff meets insured status requirements of the Social Security Act through September 30, 2019, and has not engaged in substantial gainful activity ("SGA") since March 7, 2014, the alleged onset date (Tr. 12). The claims were denied initially on July 31, 2014, and upon reconsideration on January 15, 2015 (Tr. 10), then in a hearing decision dated January 23, 2017, by Administrative Law Judge ("ALJ") Gary L. Vanderhoof (Tr. 28).

The ALJ found that the Plaintiff has severe impairments of right breast cancer, mild degenerative changes of the left and right wrists, degenerative disc disease of the cervical and lumbar spine, bilateral hip bursitis, bilateral partial shoulder tears and arthritis of the acromioclavicular joints, mild right knee degeneration, peripheral neuropathy, chronic pain syndrome, and obesity (Tr. 12), concluding that she does not have an impairment or combination of impairments

that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 12-13).

The ALJ concluded that the Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the Plaintiff can perform right overhead reaching on an occasional basis only; can handle, finger and feel bilaterally frequently; can lift and carry a maximum of twenty pounds, ten pounds frequently; can perform postural activities on an occasional basis; can stand, sit, and walk each for six hours; cannot climb ladders, ropes or scaffolds; and cannot work at unprotected heights or around dangerous moving machinery (Tr. 13).

Based on this RFC, the ALJ concluded that the Plaintiff is unable to perform any past relevant work as a hair dresser, skilled work with a specific vocational preparation ("SVP") of 6 (Tr. 20). The Plaintiff was 50-years-old on the alleged date of onset for disability, had limited education, was able to communicate in English. The ALJ found that transferability of job skills was not material as Medical-Vocational Rules as a framework supports a finding of "not disabled," and there are jobs that exist in significant numbers in the national economy that the claimant can perform (Tr. 21). The Vocational Expert ("VE") testified that the Plaintiff could perform the requirements of representative occupations such as mail

clerk, cashier, and production helper, all light, unskilled work with an SVP of 2 (Tr. 21-22).

On September 8, 2017, the Appeals Council denied a request for review, making the ALJ's determination the final agency decision (T. 1) and the Plaintiff filed a timely suit with this Court.

## Standard of Review

The standard of review for appeal of a Social Security disability determination is whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Hamlin v. Barnhart,* 365 F.3d 1208, 1214 (10th Cir. 2004) (citations omitted). Further, reversal is also appropriate where the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *Hamlin*, 365 F.3d at 1214 (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)).

## Statement of Facts

The Plaintiff was born January 15, 1964, was 50-years-old on the alleged date of onset for disability (defined as an individual closely approaching advanced age), has limited education, and is able to communicate in English (Tr. 21).

### Hearing Testimony

During hearing, the Plaintiff testified she spends significant time in bed, up to 70%-80% of her days, with difficulty walking down her long driveway with her dog (Tr. 47), has variable ability to walk, that she takes stairs sideways due to fear of falling (Tr. 57), and that she experienced symptoms of neuropathy during the hearing, with tingling feet (Tr. 60). She further testified to needing a recliner for extended sitting (Tr. 52), to sleeping poorly at night due to pain, resulting in sleep during the day (Tr. 55).

The VE testified that there would be no transferable skills from the profession of a hair stylist to any other light job (Tr. 63).

### Medical Evidence

The Plaintiff was diagnosed with high-grade infiltrating ductal carcinoma of the right breast, with following lumpectomy, repeat resection, chemotherapy,

radiation treatment, and Herceptin treatment, with the full program extending from October 2015 through March 2017 (*see* Tr. 15).

The Plaintiff's other conditions have been impacted by two separate injuries. The first, on December 8, 2005, was related to an industrial injury while working as a hair stylist, with treatment from Dr. Donald D. Kim, MD, revealing degenerative disc disease at L4-5 and L5-S1, including disc herniation abutting the left S1 nerve root (Tr. 578). Treatment continued with Dr. Kim and others into 2013, with January 22 records by Dr. Kim noting some resolution of degenerative spinal conditions (*see* Tr. 578-585). During this time, the Plaintiff earned well above what is measured as substantial gainful activity ("SGA") (*see* Tr. 219), and, of note, treatment records into 2013 from Dr. Kim report that the Plaintiff was able to return to regular work (*e.g.* Tr. 328, 333).

Into late 2013, Dr. Kim's records show diagnoses of L4-5 and L5-S1 degenerative disc disease; history of 6 mm disc herniation with left S1 nerve root impingement from 2010 MRI, now resolved based on a December 6, 2012, MRI; bilateral hip bursitis; bilateral feet swelling and numbness probably from prolonged standing; and EMG and nerve conduction evidence showing possible early polyneuropathy without lumbosacral radiculopathy (Tr. 363). Records into 2014 show that the Plaintiff's conditions had worsened following a July 2013 motor vehicle accident, resulting in a decrease in functioning from prior visits (Tr.

340-341). Dr. Kim also noted that the Plaintiff was more than five years out from her date of work-related injury, limiting what assistance she could apply for through workers' compensation programs (Tr. 342).

Dr. Kim is a Qualified Medical Examiner of the State of California, a Diplomate of the American Board of Orthopaedic Surgery, and Fellow of the American Academy of Orthopaedic Surgeons (Tr. 326). On April 7, 2014, he noted the Plaintiff's pain radiating into the lower back, buttocks, hip, leg, knee, ankle, foot, and toes, with symptoms including swelling, locking, burning pain, popping, grinding, stiffness, stabbing pain, weakness, catching, giving way, warmth, numbness, and tenderness, and these conditions aggravated by activity including prolonged sitting and standing (Tr. 323). May 19, 2014, records continued to show lumbar tenderness with limited range of motion (Tr. 885), and August 13, 2014, records show temporary relief from physical therapy (Tr. 893).

On September 22, 2014, Dr. Kim completed a narrative statement indicating that the Plaintiff is "considered unable to participate in any type of useful work force" (Tr. 440). Such an evaluation cannot establish a legal conclusion on an issue of disability, as the issue is reserved to the Commissioner of Social Security (*see* 20 C.F.R. 404.1527(e); SSR 96-5p). However, Dr. Kim also provided concrete clinical findings of limited motion of the lumbar spine; L4-5 and L5-S1 degenerative disc disease of the lumbar spine; tenderness to palpation of the right

hip; tenderness to the right trochanteric bursa; hip weakness and tenderness; and the statement that, "[t]he patient is precluded from prolonged standing, walking and no pushing, pulling or lifting greater than 10 pounds" (Tr. 446; Tr. 911).

On August 25, 2015, Dr. Ronald N. Kent, MD, PhD, a neurologist, provided a thorough review of the Plaintiff's medical history and neurological conditions, having previously administered electrodiagnostic testing, where he did not find evidence of radiculopathy (Tr. 361) but did find diminished perception of vibration in the lower extremities and indication of early polyneuropathy (Tr. 362). In 2015, Dr. Kent made a clear distinction between the Plaintiff's neuropathic and degenerative conditions, stating that, while the back problems were related to her employment injury, the numbness, paresthesias, burning dysesthesias, and weakness of the legs were not (Tr. 595). Dr. Kent noted clinical findings including paraspinal tenderness of the cervical, thoracic and lumbar spines, limited lumbar range of motion (Tr. 591), diminished sensation over the second digit of both hands and in a stocking distribution to the knees (Tr. 592), and a range of impaired activities, including much difficulty climbing stairs, working outdoors on flat ground, and some difficulty in getting on/off a toilet, sitting, reclining, dressing herself, rising up from a chair, standing, walking, performing light housework including laundry, lifting, difficulty achieving restful sleep with fatigue during the

day, and problems with grasping/gripping and driving (Tr. 577). Dr. Kent endorsed physical restrictions as previously determined by Dr. Kim (Tr. 595).

With a change of residence, the Plaintiff began treatment at the Southwest Spine & Pain Center with Dayne Johnson, PA-C, and Alan Hillstead, MD. What follows from April 2015 into 2016 is very frequent visits with attempts to manage the Plaintiff's significant pain symptoms through multiple means. April 28, 2015, records note that standing and walking caused pain, requiring rest (Tr. 640), and that Plaintiff's clinical symptoms included lumbar spine pain with extension and facet loading, SI joint tenderness, and paravertebral myofascial tenderness (Tr. 642). From that visit through October of 2016, the Plaintiff experienced fluctuating levels of independent function.

While treatment records noted at times that the Plaintiff was or was not "meeting goals with ADL's [activities of daily living] and other activities that would otherwise not be met without their current medication regimen" (*e.g.* Tr. 619, 631, 704), this phrase seems to have specific significance for pain management treatment and does not always correlate with a high level of independent function. For example, August 5, 2015, records show ability to walk long distances following one of the Plaintiff's many injections, "something she has not been able to do in a while" (Tr. 523). However, approximately a month earlier, on June 30, 2015, the Plaintiff's pain was poorly controlled, she was not able to

walk far with her dog before having to return home, she was often bed ridden due to pain, and records still stated that she *was* meeting goals with her ADL's that would not have been possible without her medication (Tr. 631). September 24, 2015, records show the Plaintiff again meeting goals, but with pain only moderately controlled and her pain intensifying with work, sleeping, chores, bathing, sitting, bending, exercise, walking, standing, driving, twisting, and functional transfers (Tr. 617). December 17, 2015, records show signs and symptoms consistent with worsening lumbar radiculopathy and with note of neurodiagnostic testing consistent with L5-S1 radiculopathy (Tr. 611; see also Tr. 725).

Records from 2016 show the Plaintiff not meeting her goals with ADL's in March (Tr. 704), pain moderately controlled and worsened by activity in April 2016 (Tr. 694) interfering with work, chores, sitting, exercise and walking in May 2016 (Tr. 686), relief in July 2016 from an epidural injection (Tr. 656), but again with August 19, 2016, records showing that pain interferes with work, sleeping, chores, dressing and undressing, bathing, sitting, exercise, walking, standing, driving, twisting, and lifting (Tr. 651).

These conditions and findings are all consistent with treatment records from Dr. Trenton L. Overall, DO, who, on July 19, 2016, diagnosed Plaintiff with lumbar radiculopathy, gait instability, and chronic pain, all permanent and stable,

with clinical evidence of radiculopathy, an uncertain prognosis due to difficult response to medications, and limitations regarding bending over, lifting heavy objects, standing for prolonged periods, and with gait instability and fall risk (Tr. 724).

In contrast with all these findings, the ALJ on multiple occasions (Tr. 18, 19) notes a single element of treatment records from one of the Plaintiff's cancer doctors, Zach Reese, MD, dated August 11, 2016, indicating that Plaintiff reported going on a walk every day for thirty to sixty minutes (Tr. 747). This single report is inconsistent with other orthopedic and pain treatment record of 2016, though it is consistent with a pattern of temporary relief related to her July epidural injection (*see* Tr. 656). The ALJ does not note Dr. Reese's further documentation that the Plaintiff experienced increased diffuse joint pain for which her pain doctor had increased her medications to five times a day, and that the Plaintiff was napping frequently during the day (Tr. 747).

## Analysis

The evidence noted above includes multiple statements of opinion from the Plaintiff's treating sources. Prior to regulatory changes effective March 27, 2017,[1] it was established under 20 CFR 404.1527(d)(2) that: "If we find that a treating

---

[1] Social Security Ruling 96-2p was repealed on March 27, 2017, and applies only to claims filed prior to that date. *See* Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 2017 WL 3928305 (Mar. 27, 2017). Plaintiff initially filed her claim in 2014.

source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by the medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." Pursuant to SSR 96-2p, even if the ALJ finds that the treating source is not entitled to controlling weight, "treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527...." Those factors included priority of a treatment relationship over an examining or non-examining relationship; length of treatment; supportability; and consistency. This has become known as the "treating physician rule."

Where the evidence as a whole can support either the agency's decision or an award of benefits, the agency's decision must be affirmed. *Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990). Further, this Court may not simply re-weigh evidence in a light more favorable to the Plaintiff. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (stating the Court "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo").

However, where the ALJ declines to give controlling weight to a treating source opinion under this "treating physician rule," he must give good reasons for assigned weight that are "sufficiently specific to make clear to any subsequent

reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." *Langley v. Barnhart*, 373 F. 3d 1116, 1119 (10th Cir. 2004) (citations and quotation marks omitted). If the ALJ rejects the opinion completely, "he must then give specific, legitimate reasons for doing so" (*Id.*), and the assignment of "little weight" to a medical opinion may be interpreted as "effectively rejecting" it. *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012).

In addition, an ALJ determining disability must consider all evidence that relates to the issue of disability and must give reasons for his or her findings, including why specific evidence was rejected. *See Grogan v. Barnhart*, 399 F.3d, 1257, 1262 (10th Cir. 2005). Further, under *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004), while evidence supporting the ALJ's determination may reasonably be omitted from discussion, there is a heightened requirement for "express analysis" of evidence that conflicts with an ALJ's conclusions.

These cases and regulations, assembled together, present affirmative obligations that the ALJ must satisfy as a matter of law. Even if the ALJ's determination might be supported by substantial evidence, he must also meet the requirements above or his decision is legally insufficient. He must consider the treating physician rule and give specific and legitimate reasons why he chooses not to follow it. In doing so, he must include why specific evidence was rejected, with

explanation sufficiently clear for subsequent reviewers to understand, and with a higher degree of attention paid to contradictory evidence.

In the present circumstance, the ALJ's assignment of weight to treating source opinion is inadequate when considering the records as a whole, necessitating remand for further development. This is particularly apparent in the ALJ's treatment of opinion evidence from Dr. Kim.

Dr. Kim treated the Plaintiff from March 2006 through his permanent and stationary evaluation on September 22, 2014 (*see* Tr. 578-588). In that evaluation, he offered specific functional limitations, stating that, "[t]he patient is precluded from prolonged standing, walking and no pushing, pulling or lifting greater than 10 pounds" (Tr. 446; Tr. 911). These findings were endorsed by another examining physician, Dr. Kent (Tr. 595). Both of these doctors have significant expertise in the specialties for which they treated the Plaintiff. There is substantial evidence, both clinical and diagnostic, in support of these doctors' findings.

Given all this, the ALJ is required to offer specific and legitimate reasons for assigning little weight to Dr. Kim's opinion (Tr. 20). The ALJ offered two points of reasoning that are correct but ultimately not dispositive in the present case, namely: the standards for determining disability in workers' compensation cases are "completely different" than the standards used in Social Security cases and the ultimate determination regarding an individual's status as disabled or not disabled

is an issue reserved to the Commissioner. In both assertions, the ALJ is correct. No special weight was or should have been given to Dr. Kim's assertion that the Plaintiff cannot be gainfully employed.

However, Dr. Kim did not offer only general statements of legal conclusion. He provided specific functional limitations that conflicted with the ALJ's findings. The ALJ found that the Plaintiff can stand and walk for six hours in an eight-hour workday, what would be described as "prolonged" standing and walking, where Dr. Kim stated that the Plaintiff cannot perform prolonged standing and walking. The ALJ opined that the Plaintiff can lift twenty pounds maximum, where Dr. Kim restricted her to lifting no more than ten pounds. These statements are not conclusory regarding the law and must be dealt with in a specific and legitimate manner.

There are two other points offered with which the ALJ could address these concrete findings. For the first, the ALJ asserts that, due to the adversarial nature of workers' compensation claims, "[t]he physicians retained by either party…are often biased and do not provide truly objective opinions. For example, the claimant's treating physician in the context of a workers' compensation claim often serves as an advocate for the claimant and describes excessive limitations to enhance the claimant's financial recovery" (Tr. 20).

The ALJ does not state that Drs. Kim or Kent showed any bias in their evaluations. He does not offer any evidence that these doctors showed bias. He does not address the fact that both doctors distinguished between the Plaintiff's conditions arising from her industrial accident and her conditions arising independently. He does not discuss how Dr. Kim returned the Plaintiff to full work status for an extended time following her work-related injury, which release could hardly be expected to enhance a workers' compensation claim, and no reasoning is offered that would allow us to understand the concludion that these doctors were describing "excessive limitations to enhance the claimant's financial recovery." The ALJ asserts this as axiomatic and uses this reason to give the opinion little weight.

With no bias actually alleged, and no evidence of any bias or attempts to "enhance the claimant's financial recovery," this cannot stand as a specific or legitimate reason to dismiss concrete, work-related limitations of function established by long term treating physicians.

For the ALJ's final reason for assigning little weight to these doctors' opinions, he notes that these doctors gave their final evaluations as of August 2015, and therefore did not have any evidence related to the Plaintiff's diagnosis of cancer and subsequent cancer treatment (*Id.*). Such a conclusion makes sense in the case of assigning weight to State agency medical consultants, who offered a less

restrictive functional capacity than that found by the ALJ (*see* Tr. 19-20). If an individual receives the additional diagnosis of cancer, with all its accompanying surgery and difficult treatment, then it is very reasonable to conclude that this individual would have *more* restrictions than without the cancer; such reasoning perfectly justifies assignment of little weight to State consultants Drs. J. Hartman, MD, and Kimberlee Terry, MD.

However, when the ALJ offers this as a reason to discount the findings of Drs. Kim and Kent, he is, in essence, stating that the Plaintiff's cancer made her *less* disabled and *more* capable of work at a higher functional capacity. For this line of reasoning to stand, the Plaintiff's years of cancer surgery, chemotherapy, and radiation therapy would have had to improve her other conditions. This line of reasoning is not compelling.

The ALJ provided four reasons for discounting the specific functional limitations found by the Plaintiff's long term treating physician, Dr. Kim, corroborated by an examining physician, Dr. Kent. Two of those reasons are technically correct but do not deal with the actual work-related limitations these doctors offered, one is implied but given without any evidentiary support, and the last does not follow from available evidence. None of these present adequately specific and legitimate reasons to decline to follow the treating physician rule. As Dr. Kim's findings contradict the ALJ's ultimate conclusions, the ALJ has failed to

meet the heightened standard required when addressing contradictory evidence, and this is not harmless error.

This Court recognizes that it is the responsibility of the ALJ to resolve conflicts within the record, including opinion evidence from treating sources, and there are conflicts present in the available evidence. Given these conflicts, it is possible that the ALJ could have established specific and legitimate reasons for declining to follow the treating physician rule. However, taking the record as a whole, the ALJ failed to do so. As a consequence, his decision is legally insufficient, and it is not our place to compensate for those deficiencies with post-hoc reasoning or analysis. *See Ringgold v. Colvin*, No. 15-6145 (10th Cir. Apr. 4, 2016) (Unpublished).

Accordingly, for the reasons stated above, the Court finds that the Commissioner's decision should reversed and remanded to address treating source opinion statements under the treating physician rule, with specific and legitimate reasons provided for the assignment of weight, and with a new decision issued in line with and supported by these new findings.

IT IS THEREFORE ORDERED that the Commissioner's decision be REMANDED to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

DATED this _18th_ day of _June_, 2018.

JUDGE BRUCE S. JENKINS
U.S. SENIOR DISTRICT JUDGE